# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JAY A. CURRY, | ) | CASE NO. 4:13-CV-00312 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Jay A. Curry ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),[1] denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 423 and 1381(a).  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

In January and February 2010, Plaintiff filed applications for DIB and SSI. (Transcript ("Tr.") 20.)  In both applications, Plaintiff alleged disability beginning October

---

[1]  On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.  She is automatically substituted as the defendant in this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

5, 2009.[2]  (*Id.*)  These applications were denied at the initial and reconsideration levels of administrative review.  (Tr. 99, 108, 120, 127.)  On December 1, 2011, an ALJ held an administrative hearing.  (Tr. 43.)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On March 23, 2012, the ALJ found Plaintiff not disabled.  (Tr. 17.)  On June 28, 2012, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On February 12, 2013, after receiving an extension of time to institute a civil action, Plaintiff filed a complaint challenging the Commissioner's final decision.  (Tr. 7, Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 17, 21, 22.)

Plaintiff asserts the following assignments of error: (1) the ALJ's analysis of whether Plaintiff's impairments met or medically equaled the Listings was not supported by substantial evidence; (2) the ALJ violated the treating physician rule by giving less than controlling weight to the opinions of treating physicians Drs. Keaton and Mandel; and (3) the ALJ erred by giving great weight to the opinions of state consultative examiners Drs. McCloud and Waddell.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on March 21, 1960, and was 49-years-old on his alleged disability onset date.  (Tr. 30.)  He had at least a high school education and was able to

---

[2]    At his administrative hearing, Plaintiff requested an amended onset date of May 18, 2009.  (Tr. 81.)  In her decision, the ALJ refers to October 5, 2009, as the alleged onset date.  (Tr. 22.)

2

communicate in English.  (Tr. 31.)  He had past relevant work as an electrician.  (Tr. 30.)

**B.**   **Medical Evidence**

   **1.**   **Evidence of Physical Limitations**

      **a.**   **Medical Reports**

On October 5, 2009, Plaintiff was involved in a motor vehicle accident.  (Tr. 732.) He sustained multiple fractures and underwent an open reduction and internal fixation of the second metetarsal of the right foot, surgical repair of a right patella fracture and tendon, and surgical repair of a left ankle fracture.  (Tr. 683, 686, 732.)  Ten days later, Plaintiff was discharged from the hospital to a nursing facility with instructions to follow up with neurosurgery for his transverse process fractures, to follow up with orthopedics for suture removal, and to follow up with the trauma service as needed.  (Tr. 733.)

On October 15, 2009, Plaintiff was admitted to Parma Community General Hospital to begin strengthening, gait training, and activities of daily living ("ADL") retraining.  (Tr. 815.)   When admitted, Plaintiff's pain was "out of control," particularly the pain in his back which was exacerbated by a transverse fracture of his lumbar spine. (*Id.*)  At the time of his discharge on October 30, 2009, he was tolerating passive range of motion with the right knee and could ambulate 50 feet four times with some contact guard assistance (*i.e.,* with the physical therapist having one or two hands on Plaintiff) and non-weight bearing on the right lower extremity.  (*Id.*)

From November 3, 2009, through December 12, 2009, Plaintiff participated in in-home therapy for his decreased gait, strength, balance, and range of motion in his right

3

ankle and toes.  (Tr. 884-898.)  On November 6, 2009, Plaintiff was able to ambulate with a walker and perform simple activities of daily living and change positions with moderate assistance.  (Tr. 877.)  On November 10, 2009, five weeks after his surgery, James D. Solmen, M.D., Plaintiff's orthopedic surgeon, prescribed an air cast boot.  (Tr. 1004.)  In December 2009, Plaintiff still had pain and a slight limp, but was doing well with weight bearing on his right lower extremity.  (Tr. 887.)  On December 23, 2009, Thomas A. Joseph, M.D., reported that Plaintiff was "actually doing quite well for being only 2 months out from a patellar tendon repair."  (Tr. 1002.)  Dr. Joseph wrote Plaintiff a prescription for Vicodin and Arthrotec but advised him to obtain future prescriptions from his primary care physician because he was seeing multiple physicians at that time.  (*Id.*)  On that same day, Dr. Solmen noted that Plaintiff was "pretty much pain free while in the boot walker" but noticed more pain when he had taken the boot off for a couple of days.  (Tr. 1003.)  Dr. Solmen began weaning Plaintiff out of the boot and into a shoe, noting that he would benefit from orthotics to help support the midfoot.  (*Id.*)

On January 11, 2010, Plaintiff reported 6 out of 10 pain in his right knee and right foot and continued problems with ambulation for which Vicodin was prescribed.  (Tr. 1028.)  On January 20, 2010, he went to the emergency room for right knee pain following a fall.  (Tr. 932-934.)  At an appointment on January 25, 2010, Plaintiff reported increased right knee pain.  (Tr. 1027.)

On February 10, 2010, Plaintiff reported that he had stopped his physical therapy because it was not helping.  (Tr. 1025.)  He also reported increased pain in his right hip.  (*Id.*)  In late February, Dr. Solmen noted that Plaintiff's arch support provided significant pain relief for his right foot.  (Tr. 1001.)  Plaintiff had occasional pain related to

4

increased weight-bearing activities.  (*Id.*)  An examination showed that his right foot incision was well-healed, no edema or swelling existed, and his sensation was intact. (*Id.*)  His ankle had a full range of motion and full muscle strength.  (Tr. 1001.)  Drs. Joseph and Solmen instructed Plaintiff to continue with his physical therapy, home exercise program, orthotics, and patellar mobilization.  (Tr. 1000-1001.)

In early March 2010, Plaintiff presented to William A. Seeds, an orthopedist, reporting right hip pain.  (Tr. 1044.)  Plaintiff indicated that he had been using a cane. (*Id.*)  Dr. Seeds noted pain to palpation of the greater trochanter and reduced abduction secondary to pain.  (Tr. 1045.)  Plaintiff had a full range of motion in his joints, bones, and muscles and no instability.  (*Id.*)  X-Rays of Plaintiff's hip joint appeared normal. (Tr. 1046.)  Dr. Seeds opined that Plaintiff had trochanteric tendonitis and injected Plaintiff's greater trochanter with DepoMedrol.  (*Id.*)  He also prescribed physical therapy for right hip strengthening.  (Tr. 1043.)  On March 29, 2010, Dr. Seeds noted that Plaintiff had significant crepitus of the patellofemoral joint with catching of the knee and medial joint pain consistent with a positive McMurray's test and meniscal pathology all secondary to his previous trauma.  (Tr. 1122.)  Dr. Seeds also noted decreased knee flexion and loss of range of motion of the metatarsal phalangeal joint.  (Tr. 1122-1123.) Dr. Seeds' impressions included "significant trauma from an MVA to the Right Lower extremity with previous patellar surgery and metatarsal surgery" and "signs and symptoms consistent with Lisfranc injury of the foot and patellofemoral articular and medial articular meniscal pathology."  (Tr. 1123.)  Dr. Seeds ordered an MRI of the right foot and knee.  (*Id.*)  Plaintiff returned to Dr. Seeds in April 2010.  (Tr. 1118.)  He had some swelling and ecchymosis of the foot, but his incisions were in tact and he had no

5

active drainage, a full range of motion, no instability, and full muscle tone and strength. (Tr. 1119.)

Plaintiff also saw Marc Berkowitz, DPM, in late March 2010.  (Tr. 1156.)  Plaintiff reporting having been ambulating with pain and the assistance of a cane following the operation he underwent three days after his motor vehicle accident.  (*Id.*) Plaintiff had been experiencing increasing pain and discomfort that limited his ability to wear close-toed shoes, ambulate without pain, and perform his daily activities.  (Tr. 1113.)   Dr. Berkowitz diagnosed a hallux rigidus (right foot) and painful hardware (right).  (Tr. 1156.)  On April 6, 2010, Dr. Berkowitz surgically removed a screw from Plaintiff's right foot and implanted a new prosthetic toe replacement.  (Tr. 1113-1115, 1155.)

On May 13, 2010, Plaintiff presented to Jeffrey Brodsky, D.O., with complaints of knee pain.  (Tr. 1252.)  Plaintiff told Dr. Brodsky that his knee gives out and causes pain.  (*Id.*)  Dr. Brodsky noted tenderness over the medial joint space, a positive McMurray's test for medial joint space discomfort, and a well-healed incision inferior to the patella.  (*Id.*)  He recommended Plaintiff use a cane and undergo arthroscopic surgery as well as begin physical therapy for his back and neck.  (*Id.*)  On May 19, 2010, Dr. Brodsky performed an arthroscopy of the right knee and a partial lateral meniscectomy.  (Tr. 1249.)  An examination of the suprapatellar pouch revealed no significant pathology; the articular surface of the patella was intact; the lateral compartment showed rim tears; and the anterior cruciate ligament and medical compartment were intact.  (*Id.*)

Plaintiff went to the emergency room on June 9, 2010, after a fall exacerbated his back and right knee pain.  (Tr. 1315.)  Imaging showed multiple fractures of the patella

with either edema or hemorrhage and bone spurs at L4-L5.  (Tr. 1325-1327.)  Shortly

after his June 2010 fall, Plaintiff reported to Robert Kakish, D.O.  (Tr. 1332.)  Dr. Kakish

noted numbness radiating from the neck down the left arm, mild limitation in flexion in

the right knee, and tenderness at the base of the toes of Plaintiff's right foot.  (Tr. 1333.)

Dr.  Kakish assessed right knee pain secondary to a sprain on top of Plaintiff's

arthroscopic knee surgery, right foot pain, chronic lumbar pain, and a history of

depression.  (*Id.*)  Dr. Kakish prescribed Flexeril and Vicodin for Plaintiff's pain.  (*Id.*)  On

November 2, 2010, Dr. Kakish opined that Plaintiff "has multiple chronic pain issues,

which significantly limit[] his ability to do any type of physical work.  I do not believe

[Plaintiff] would be employable to do any type of physical job."  (Tr. 1464.)

　　　In July 2010, Michael Retino, M.D., examined Plaintiff.  (Tr. 1361-1362.)  Dr.

Retino's exam revealed atrophy of Plaintiff's right quad and calf muscles, "quite a bit" of

patellar crepitus, and catching sensation.  (Tr. 1361.)  Dr. Retino noted that Plaintiff's

knee would be "problematic . . . from this point on" and recommended aggressive

rehabilitation.  (Tr. 1362.)  At a physical therapy consultation on August 5, 2010, Plaintiff

expressed difficulty standing for long periods, walking long distances, squatting, lifting,

and climbing ladders.  (Tr. 1363.)  After two sessions, Plaintiff cancelled his physical

therapy due to increasing pain.  (Tr. 1392.)

　　　Plaintiff returned to Dr. Retino on September 24, 2010, with continuing knee pain

and muscle atrophy.  (Tr. 1446.)  Following an MRI of Plaintiff's right knee, Dr. Retino

opined that Plaintiff had advanced posttraumatic arthritis of the patellofemoral joint.  (Tr.

1445.)  Plaintiff underwent right knee arthroscopic surgery in December 2010.  (Tr.

1389.)  One month after surgery, Dr. Retino noted that Plaintiff had a full range of

7

motion, but he had generalized patellofemoral and median compartment irritation with palpation and maneuvers.  (Tr. 1443.)  Dr. Retino gave Plaintiff a cortisone injection, which did not help with his knee pain.  (Tr. 1442-1443.)  At that time, Plaintiff reported being miserable and wanting to proceed with a knee replacement.  (Tr. 1442.)  In March 2011, Dr. Retino began treating Plaintiff with Orthovisc injections and prescribed Vicodin.  (Tr. 1439-1441.)

In April 2011, Plaintiff saw David R. Mandel, M.D., a rheumatologist, and reported morning stiffness in his wrists, elbows, and shoulders.  (Tr. 1470, 1477.)  Plaintiff had no effusion or swelling but had some tenderness in his hips and lower legs and a reduced range of motion in his right knee.  (Tr. 1471, 1477.)  Dr. Mandel observed four out of five muscle strength in the right lower extremity and five out of five in the left lower extremity with intact sensation and reflexes.  (Tr. 1477.)  Dr. Mandel administered a corticosteriod injection and ordered laboratory tests to rule out rheumatoid arthritis and other systemic diseases.  (Tr. 1472.)  He also stated that he would use fibromyalgia as a "working diagnosis."  (*Id.*)

After appointments with Plaintiff on April 7, 2011, and May 19, 2011, Dr. Mandel completed an Arthritis Residual Functional Capacity Questionnaire.  (Tr. 1536-1538.)  Dr. Mandel opined that Plaintiff was capable of doing low stress jobs and that his medications caused dizziness, drowsiness, and hallucinations.  (Tr. 1537.)  He indicated that Plaintiff could stand and/or walk for less than two hours in an eight-hour workday; sit for about two hours in an eight-hour workday; needed to walk every ninety minutes for two minutes at a time; and required unscheduled breaks every three hours for fifteen minutes.  (*Id.*)  Dr. Mandel reported that Plaintiff required a cane and could only lift on

8

an occasional basis and up to twenty pounds.  (Tr. 1538.)  He also opined that Plaintiff

would miss work more than four times per month.  (*Id.*)

In November 2011, Gary J. Most, D.P.M., completed a Medical Source

Statement Regarding Leg/Foot Impairment(s) and opined that Plaintiff could stand/walk

for less than two hours in an eight-hour workday.  (Tr. 1593.)  Dr. Most further opined

that Plaintiff could only stand for 15 to 30 minutes at a time.  (*Id.*)  He also noted that

Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, could

not walk enough to shop or bank, and could not climb a few steps at a reasonable pace

with the use of a single handrail.  (*Id.*)  Dr. Most rated Plaintiff's pain as "extreme," which

was defined as a major limitation with no useful ability to function (48% on task in an

eight-hour workday).  (*Id.*)

### b.      State Agency Reports

In April 2010, W. Jerry McCloud, M.D., reviewed the medical evidence of record

and opined that Plaintiff retained the ability to occasionally lift and/or carry twenty

pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in

an eight-hour workday; sit for about six hours in an eight-hour workday; and could

occasionally perform postural activities except that he could not climb ladders, ropes, or

scaffolds.  (Tr. 1158-1164.)  Non-examining state agency physician Bradley J. Lewis,

M.D., reviewed Plaintiff's record and affirmed Dr. McCloud's assessment.  (Tr. 1387.)

### 2.      Evidence of Mental Limitations

### a.      Medical Reports

Plaintiff has a history of depression and substance abuse.  In May 2009, he

reported to Ashtabula County Medical Center with thoughts of suicide after he "blew [his] sobriety" and lost his job and a place to live. (Tr. 526.) Plaintiff was admitted and tested positive for cocaine. (Tr. 519.) Upon release, he took twenty pills of Ultram and smoked crack cocaine. (Tr. 513.) He returned to the emergency room and was admitted to the intensive care unit for further evaluation. (*Id.*) At both visits, Plaintiff treated with Daniel Keaton, M.D., who diagnosed major depression, moderate to severe, and polysubstance abuse. (Tr. 488, 519.)

On June 23, 2009, Plaintiff saw Dr. Keaton for a psychiatric evaluation and reported that he was entering a drug rehabilitation program. (Tr. 992, 995.) Plaintiff had good grooming and hygiene, appeared pleasant and euthymic, had a full affect, and described his mood as "really good." (Tr. 993.) Dr. Keaton assessed major depression (moderate recurrent without psychosis), polysubstance dependence in early full remission, and chronic pain. (*Id.*) Dr. Keaton noted that Plaintiff manifested a low risk of acute harm to himself or others and a moderate risk of harm on a chronic basis as demonstrated by his history, biopsychosocial assessment, subjective and objective presentation, and modifiable risk factor status. (*Id.*)

On July 30, 2009, Plaintiff told Dr. Keaton that he was experiencing increased anxiety, poor energy, depressed mood, and loss of interest. (Tr. 987.) He denied any significant exacerbation of depression. (*Id.*) Dr. Keaton reported that Plaintiff had good grooming, hygiene, eye contact, and interaction. (*Id.*) Plaintiff had increased speech and appeared fidgety, but his thought process was linear and organized, and his thought content had frequent but mild depressive cognitions and mild to moderate anxiety. (*Id.*) Dr. Keaton advised Plaintiff to return to him after completing rehabilitation

10

for his addictions.  (Tr. 988.)

In August 2009, Plaintiff presented to the emergency room reporting acute anxiety and intoxication after leaving his treatment facility.  (Tr. 602.)  He was admitted to the hospital for six days.  (*Id.*)  Following his discharge, he followed up with Dr. Keaton for major depression, anxiety, and polysubstance dependence.  (Tr. 982.) Plaintiff reported "psychological issues" including symptoms of "flashes" and "seeing things that are not there."  (*Id.*)  On examination, Plaintiff had good grooming, hygiene, eye contact, and interaction.  (*Id.*)  His thought process was linear, organized, and logical, and his thought content included mild and infrequent depressive cognitions and anxiety.  (*Id.*)

In October 2009, Plaintiff told Dr. Keaton that he had left rehabilitation because his roommate threatened him.  (Tr. 978.)  He reported having been accepted into the Substance Abuse Mental Illness Program ("SAMI").  (Tr. 670-671, 978.)  On examination, Dr. Keaton reported that Plaintiff had good grooming, hygiene, eye contact, and interaction and a euthymic mood and full affect.  (Tr. 978.)  His thought process was linear, organized, and logical; his thought content included infrequent and mild depressive thoughts and anxiety; and he had good to fair insight and judgment. (*Id.*)

Plaintiff returned to Dr. Keaton in December 2009 after he had been involved in a motor vehicle accident. (Tr. 971.)  He reported a tremendous amount of physical pain and increased anxiety.  (*Id.*)  Dr. Keaton observed that Plaintiff appeared to cry at times but produced no tears.  (*Id.*)  On examination, Plaintiff had good grooming, hygiene, eye contact, and interaction.  (*Id.*)  His mood appeared calm to anxious to saddened and

tearful.  (*Id.*)  Plaintiff had a full affect and his speech was increased in quantity, but otherwise normal.  (Tr. 972.)  His thought process was linear and organized.  (*Id.*)  His thought content included depressive and anxious thoughts.  (*Id.*)  He had fair to good insight and judgment.  (Tr. 971-972.)

In January 2010, Plaintiff told Dr. Keaton that his depression medication was working.  (Tr. 968.)  He told Dr. Keaton that he was experiencing anxiety from being cited for OVI but was not suicidal.  (*Id.*)  His insight and judgment appeared good to fair. (Tr. 969.)  Dr. Keaton described Plaintiff's mood and anxiety as "grossly stable with some continued symptoms."  (*Id.*)

In February 2010, Plaintiff told Dr. Keaton that he was feeling pretty good and was not depressed.  (Tr. 963.)  He stated that a felony charge related to his motor vehicle accident had been dropped.  (*Id.*)  On examination, Plaintiff had good grooming, hygiene, eye contact, and interaction.  (*Id.*)  Dr. Keaton noted that Plaintiff had abnormal thought content and minor and infrequent depressive cognitions and anxious thoughts. (*Id.*)  He had good to fair insight and judgment and his mood and anxiety was "grossly stable."  (Tr. 963, 964.)

In March 2010, Plaintiff returned to Dr. Keaton, denying exacerbation of psychopathology and noting that his current medication regimen and counseling had been beneficial.  (Tr. 1109.)  Dr.  Keaton observed that Plaintiff limped and walked with a cane but that his strength, tone, gait, and station were good to fair.  (*Id.*)  Plaintiff's thought content included situational depressive and anxious thoughts.  (*Id.*)

On April 26, 2010, Plaintiff reported to the emergency room and was admitted after alleging suicidal ideation following an altercation with his parents and loss of

housing.  (Tr. 1169, 1193.)  During a psychiatric evaluation, Plaintiff admitted that he was sad but not depressed.  (Tr. 1169.)  He stated that he was not currently suicidal but felt that he would quickly decompensate and become suicidal if he were to be discharged and not have a place to stay.  (*Id.*)  He saw Dr. Keaton, who reported that Plaintiff had good to fair grooming, hygiene, eye contact, and interaction.  (*Id.*) Dr. Keaton also noted that Plaintiff's thought process was generally linear and organized and his thought content included depressive cognitions, anxious thoughts, and suicidal ideations.  (*Id.*)

In June 2010, Plaintiff told Dr. Keaton that he had reconnected with a girl from high school and was engaged.  (Tr. 1353.)  Plaintiff had good grooming, hygiene, eye contact, and interaction.  (*Id.*)  He smiled and had "tears of joy" about his upcoming marriage.  (*Id.*)  Plaintiff's mood was euthymic and mildly anxious, his affect was full, and his thought process was linear and organized.  (*Id.*)  His thought content included situational depressive cognitions and baseline anxiety.  (*Id.*)  He had good to fair judgment.  (*Id.*)

In August 2010, Plaintiff told Dr. Keaton that he was happy.  (Tr. 1551.)  Plaintiff had a covenant marriage with a woman and had joined a church.  (*Id.*)  He had good grooming, hygiene, eye contact, and interaction, and his mood was "good" and "happy." (*Id.*)  His thought process was linear and organized and his thought content included "very minor and infrequent depressive thoughts and anxious thoughts."  (Tr. 1551.)  Dr. Keaton opined that Plaintiff's mood and anxiety had improved and stabilized.  (Tr. 1552.)  Around that same time, Dr. Keaton completed a Mental Functional Capacity Assessment for the Ohio Department of Jobs and Family Services.  (Tr. 1368-1370.)

Dr. Keaton listed Plaintiff's diagnoses as major depression and anxiety disorder.  (Tr. 1370.)  Dr. Keaton opined that Plaintiff was extremely limited in his ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and travel in unfamiliar places or use public transportation.  (Tr. 1368.)  Dr. Keaton also rendered the following opinion:

> From serial observations and mental status exams of [Plaintiff] in the inpatient and outpatient setting, it is my opinion with reasonable medical certainty that mental illness impairs his social and occupational functioning.  His mental illness impairs ability and functional capacity to perform duties in the workplace, and obtain/maintain gainful full-time employment.  Further, it is my opinion, while he may desire such employment, it is against medical advice; employment would likely result in a further decompensation of mental illness and pose a risk of harm to self or others.

(Tr. 1369.)

On January 7, 2011, Dr. Keaton completed an Assessment of Ability to do Work-Related Activities (Mental) and opined that Plaintiff had marked and extreme limitations in functioning and would miss work at least three days per month.  (Tr. 1425-1426.)  Dr. Keaton also opined that Plaintiff has been disabled since May 18, 2009.  (Tr. 1426, 1534.)

Plaintiff returned to Dr. Keaton in March 2011, noting that he was not depressed or suicidal but "not totally where I need to be."  (Tr. 1544.)  Dr. Keaton reported good grooming and hygiene, good eye contact and interaction, fair to good strength, tone, gait,

14

and station, and a linear and organized thought process.  (*Id.*)  His insight and judgment appeared good to fair.  (*Id.*)  Dr. Keaton noted abnormal thought content, situational depressive cognitions, and anxious thoughts.  (*Id.*)

In June 2011, Plaintiff told Dr. Keaton that was going to become legally married.  (Tr. 1541.)  He noted that overall he was "doing well."  (*Id.*)  Dr. Keaton reported that Plaintiff had less depression and anxiety.  (*Id.*)  Plaintiff stated that he was working at his wife's business and feeling well overall.  (*Id.*)

In August 2011, Plaintiff was admitted to the hospital after relapsing on crack cocaine.  (Tr. 1564.)  At a September 2011 appointment with Dr. Keaton, Plaintiff reported that he and his wife had recently been arrested following an incident of domestic violence.  (Tr. 1557.)  Plaintiff told Dr. Keaton that at the time of the incident, he was taking a drug he had purchased on the Internet that "acts like an opiate" and had consumed a twelve-pack of beer.  (*Id.*)

### b.    State Agency Reports

John Waddell, Ph.D., reviewed Plaintiff's record in April 2010.  (Tr. 1140-1143.)  Dr. Waddell opined that Plaintiff appeared capable of understanding, remembering, and following at least one and two step tasks; relating adequately to co-workers, supervisors, and the public; and performing work activities in a setting with regular expectations and few changes due to his reduced stress tolerance.  (Tr. 1142.)  State agency examiner Catherine Flynn, PsyD., reviewed Plaintiff's record and affirmed Dr. Waddell's assessment. (1358.)

### C.    Hearing Testimony

1.      **Plaintiff's Hearing Testimony**

At his hearing on December 1, 2011, Plaintiff appeared and testified as follows:

Plaintiff lived with his wife, who drove him to the hearing.  (Tr. 47.)  He did not have a valid driver's license; his license was suspended after he was charged with OVI following his involvement in a head-on car accident on October 5, 2009.  (*Id.*)

Plaintiff had a high school education and some training from a vocational school. (Tr. 48.)  He became an LPN nurse in 1992 but no longer has his nursing certification.  (*Id.*) He had also worked as an electrician.  (*Id.*)  At the time of the hearing, Plaintiff was in recovery for alcohol abuse and had been sober for about six months.  (*Id.*)  He regularly attended AA meetings and church.  (Tr. 49.)  He struggled with depression and found it difficult to keep a job.  (Tr. 57.)

Plaintiff could prepare meals, wash dishes, do laundry, take out the trash, and push a cart in a store.  (Tr. 49-50.)  He had no problems grooming himself.  (Tr. 50.)  He played the guitar, studied the Bible, used the Internet, and attended church twice a week.  (Tr. 51.) While his wife was at work during the day, Plaintiff would straighten up the house.  (Tr. 52.) "I can do small, little things for a little bit and then I have to sit down whenever it gets – you know – I don't push myself anymore." (*Id.*)  Plaintiff's sleep was sporadic.  (Tr. 54.)

Plaintiff had a C2-C3 herniated disc in his neck with extensive arthritis.  (Tr. 59.)  It caused tension headaches and pain throughout his shoulder and down his arm.  (*Id.*)  He severed his patella tendon and shattered his kneecap in a car accident.  (*Id.*)  He had about five laproscopic surgeries and torn meniscus repair.  (*Id.*)  At the time of hearing, he felt he was at the point where he required a knee replacement.  (*Id.*)  He shattered his right foot in his October 5, 2009, car accident.  (*Id.*)  He had a partial toe joint replacement that failed.

16

(Tr. 60.)  He had sciatic pain that ran through his right buttock and pain in his elbows due to arthritis and the normal wear-and-tear of his body caused by his work in construction. (*Id.*)

Plaintiff could not stand for long periods of time or sit in the same position for long periods of time without becoming uncomfortable.  (Tr. 60.)  He could not walk long distances because his knee and lower back would begin to hurt.  (*Id.*)  "To walk down to the mailbox and back, by the time I get back, my right knee is really hurting bad."  (Tr. 61.) Plaintiff could not lift heavy objects because of his right knee and lower back.  (*Id.*)  He could comfortably carry a two or three pound bag of sugar.  (*Id.*)  He could not squat like he used to when he worked as an electrician.  (Tr. 62.)  He could bend at the waist but could not remain bent over without experiencing pain.  (*Id.*)  He sometimes had difficulty reaching above his head.  (Tr. 68.)  He could open jars, use eating utensils, and write.  (Tr. 69.)  Following his car accident, he used a wheelchair, followed by a walker, and then a cane beginning in June 2010.  (Tr. 80.)

Plaintiff had been depressed since he was a child.  (Tr. 63.)  As a child, he experienced abuse, abandonment, rejection, multiple fathers, and several relocations. (*Id.*) Plaintiff's antidepressant medications "seem to help."  (*Id.*)  He stopped taking narcotic pain medicine because it caused him to relapse and turned him into a "monster."  (Tr. 65.) Plaintiff took medications for his depression and physical pain.  (Tr. 64-67.)  The only side effects he experienced from his medications were drowsiness and mild shakiness.  (Tr. 67.) He experienced anxiety when being around large crowds, except when he attended church. (Tr. 70.)  He had experienced anxiety attacks in the past.  (*Id.*)  Dr. Keaton had been Plaintiff's treating psychiatrist since May 2009.  (Tr. 71.)  Plaintiff had gone to the hospital

for a mental impairment about three or four times since May 2009.  (Tr. 72-73.)

### 2. Vocational Expert's Hearing Testimony

Nancy A. Borgeson, PhD, a vocational rehabilitation specialist, testified as a vocational expert at Plaintiff's hearing.  (Tr. 73.)  The ALJ asked the VE to assume an individual with the same age, education, and employment background as Plaintiff.  (Tr. 75.) The hypothetical individual could lift and carry 20 pounds occasionally and 10 pounds frequently.  (*Id.*)  The individual could stand and walk for six hours and sit for six hours, but would require a sit/stand option every hour for about five minutes.  (*Id.*)  The individual could reach in front and occasionally overhead.  (*Id.*)  The individual could handle, finger, and feel.  (*Id.*)  The person could not be exposed to any hazardous conditions; would be performing simple, routine tasks with simple, short instructions; would make simple, work-related decisions; would have few workplace changes with minimal public contact and superficial contact with co-workers and supervisors.  (Tr. 76.)

The VE testified that the hypothetical individual described above would not be able to perform Plaintiff's past work.  (*Id.*)  The individual would be capable of performing the following types of work:  bench assembler at the light, unskilled level (5,000 jobs regionally and 289,000 nationally); cleaner or housekeeper at the light level (2,500 jobs regionally and 1,000,000 nationally); and mail clerk (not in the post office) at the light, unskilled level (1,400 jobs regionally and 139,000 nationally).  (*Id.*)

The ALJ posed a second hypothetical to the VE, noting that the individual could lift the same amounts as those in the first hypothetical, but could only stand and walk for two hours out of an eight-hour day, could sit for six hours, and would require a sit/stand option. (Tr. 76-77.)  The other limitations stated in the first hypothetical would remain the same.

18

(Tr. 77.)  The VE testified that the hypothetical individual could perform the following work at the sedentary, unskilled level: assembler, such as in the optical industry (2,000 jobs regionally and 150,000 nationally); inspector, such as a table worker (5,000 jobs regionally and 473,000 nationally); and general office clerk, such as a charge account clerk (2,100 jobs regionally and 220,000 nationally).  (*Id.*)

The VE opined that an individual who would be absent from work at least three times per month would not be able to sustain competitive employment.  (Tr. 78.)  The VE also testified that an individual who was off-task 18% of the workday would be incapable of sustaining full-time work.  (Tr. 82.)  In response to questioning by Plaintiff's counsel, the VE testified that an individual would be incapable of performing any of the previously identified jobs if the individual needed to a hold a cane in his right hand to ambulate.  (Tr. 78-79.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*.  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990)*.  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability

benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2012.

2.  Plaintiff has not engaged in substantial gainful activity since October 5, 2009, the alleged onset date.

3.  Plaintiff has the following severe impairments: major depression, anxiety, polysubstance dependence, degenerative disc disease of the lumbar and cervical spine, and degenerative joint disease of the right knee and right great toe.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that Plaintiff has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), specifically that he lift and carry 20 pounds occasionally and 10 pounds frequently, he can stand, walk, and sit for six of eight hours.  In addition:

- He must have the option to sit or stand every hour for five minutes.
- He can occasionally climb stairs and ramps.
- He can occasionally bend and balance, and can never kneel or crawl.
- He can reach in front, and can occasionally reach overhead.
- He can handle, finger, and feel.
- He must not be exposed to hazardous conditions.
- He can perform simple routine tasks, with simple short instructions, making simple work related decisions, having few workplace changes, with minimal (occasional) public contact, and superficial contact with co-workers and supervisors.

6.    Plaintiff is unable to perform any past relevant work.

7.    Plaintiff was born on March 21, 1960, and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Plaintiff subsequently changed age category to closely approaching advanced age.

8.    Plaintiff has at least a high school education and is able to communicate in English.

. . . . .

10.   Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform.

11.   Plaintiff has not been under a disability, as defined in the Act, from October 5, 2009, through the date of this decision.

12.   Plaintiff's substance abuse is an issue that is not material to the decision in this matter.

(Tr. 22-32.)

## V.    LAW & ANALYSIS

21

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B.    Plaintiff's Assignments of Error

#### 1.    Whether the ALJ's Analysis of Whether Plaintiff's Impairments Met or Medically Equaled the Listings was Supported by Substantial Evidence.

22

Plaintiff argues that substantial evidence does not support the ALJ's conclusion at step three of the sequential analysis, and that the ALJ did not fully evaluate this issue.  Specifically, Plaintiff argues that evidence in the record demonstrates that he satisfies the requirements of Listing 1.02(A), and the ALJ erred in failing to analyze that Listing in denying his application. The Commissioner responds that substantial evidence supports the ALJ's conclusion at step three, because two state agency physicians opined that Plaintiff did not meet or equal a Listing, Plaintiff never raised the issue of meeting or equaling Listing 1.02(A) at his hearing, and the ALJ's decision demonstrates that the ALJ did not believe Plaintiff met the Listing.  For the reasons discussed below, Plaintiff's arguments are well taken.

At the third step of the sequential analysis, an applicant will be found disabled if his impairment meets or equals one of the impairments contained in the Listing of Impairments ("Listings").  20 C.F.R. § 404.1525(a).  A claimant must satisfy all of a Listing's criteria in order to be found disabled on that basis.  20 C.F.R. § 404.1525(c)(3). Listing 1.02(A) sets forth the criteria for major dysfunction of a joint due to any cause. *See* 20 C.F.R. Pt. 404, Subpt. 404, App. 1, 1.02.  Plaintiff contends that he satisfies the requirements of section (A) of Listing 1.02, which states:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively,

23

as defined in 1.00B2b.[3]

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 1.02(A).

Here, the ALJ concluded at step two of her analysis that Plaintiff's degenerative joint disease of the right knee and right great toe is a severe impairment.  (Tr. 22.)  In her third-step analysis, the ALJ stated that she considered Listings 1.04, 12.04, 12.06, and 12.09 and determined that Plaintiff did not have an impairment that met or equaled

---

[3]     20 C.F.R. Pt. 404, Subpt. 404, App. 1, 1.00(B)(2)(b), provides:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

a listing.[4]  (Tr. 23-24.)  The ALJ did not mention Listing 1.02(A).  (*Id.*)  Plaintiff argues that the ALJ's failure to even mention this Listing rendered her step three findings to be without support in substantial evidence.

Plaintiff relies on the Sixth Circuit's decision in *Reynolds v. Comm'r of Soc. Sec., 424 F. App'x 411 (6th Cir. 2011)*, to support his argument.  In that case, the ALJ determined, at step two of the sequential analysis, that the claimant had the severe impairments of back pain and adjustment disorder.  At step three of the analysis, the ALJ made a general conclusion that the claimant's impairments did not satisfy the criteria for any listing in Section 1.00, which addresses musculoskeletal conditions, or in Section 12.00, which addresses mental impairments.  Thereafter, although the ALJ continued to discuss the criteria for Listing 12.04 in detail, the ALJ did not address any specific listing in Section 1.00.

The Sixth Circuit determined that the ALJ had erred in failing to analyze whether the claimant's back impairment satisfied the criteria for any of the Listings in Section 1.00.  *Id.* at 416 ("Ultimately, the ALJ erred by failing to analyze [the claimant's] physical condition in relation to the Listed Impairments.  Put simply, he skipped an entire step of the necessary analysis.").  According to the Sixth Circuit, the ALJ's failure to do so deprived the court of the ability to conduct a meaningful review of his decision:

> In short, the ALJ needed to actually evaluate the evidence, compare it to Section 1.00 of the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review.  Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial

---

[4]     Listing 1.04 addresses disorders of the spine and listings 12.04, 12.06, and 12.09 relate to mental impairments.

evidence.

*Id.*

In *Reynolds,* the ALJ generally concluded, in the first paragraph of his analysis, that Plaintiff's impairments did not satisfy the criteria of Listing 1.00 or Listing 12.00, and then proceeded to analyze the criteria of only Listing 12.04, without any further discussion of Listing 1.00.  Here, the ALJ did not go as far as even mentioning Listing 1.02, even after concluding in her step two analysis that Plaintiff had the severe impairment of degenerative joint disease of the right knee and right great toe.  Thus, the ALJ's failure to discuss Listing 1.02 altogether is even more problematic than the conclusory third-step analysis that the court rejected in *Reynolds.*  Application of *Reynolds* to this case results in the conclusion that the ALJ erred in failing to address whether Plaintiff's degenerative joint disease satisfied the criteria of Listing 1.02, which governs major dysfunction of a joint(s).  *See Shea v. Astrue*, No. 1:11-CV-1076, 2012 WL 967088 (N.D. Ohio Feb. 13, 2012) (Burke, M.J.) ("Without more than a conclusory statement regarding [the plaintiff's] physical impairments, the Court is deprived of the opportunity to provide meaningful judicial review and cannot determine whether the ALJ's conclusion is supported by substantial evidence.")

To the extent the Commissioner asserts that the medical evidence does not support a finding that Plaintiff satisfies Listing 1.02(A), and that the ALJ discussed – at other points in her decision –  evidence that precluded the application of the Listing, those arguments are not well taken.  While the Commissioner is correct in noting that the ALJ discussed medical evidence in her step four analysis relating to Plaintiff's lower extremity conditions (Tr. 25-27, 29), absent some analysis  from the ALJ regarding

26

those medical observations and their relation to the criteria of Listing 1.02(A), this Court cannot meaningfully determine whether substantial evidence supports the ALJ's conclusion that Plaintiff's right lower extremity conditions did not satisfy that Listing. *See, e.g., Davis v. Comm'r of Soc. Sec.,* 5:12 CV 2577, 2013 WL 3884188 (N.D. Ohio July 26, 2013) (Gwin, J.) (remanding where the ALJ provided no discussion of medical records regarding the plaintiff's MS and their relation to Listing 11.09(A)); *Grohoske v. Comm'r of Soc. Sec.*, 3:11 CV 410, 2012 WL 2931400, *3, n.53 (N.D. Ohio July 18, 2012) (Baughman, M.J.) (remanding, noting that "the ALJ's discussions at step four were not so extensive as to provide sufficient evidence of [the plaintiff's] impairments in light of the listing as to permit a court to conclude from other parts of the ALJ's opinion that the listings were not met.")  For the foregoing reasons, Plaintiff's first assignment of error presents an adequate basis for remand.

### 2.   Whether the ALJ Violated the Treating Physician Rule by Giving Less than Controlling Weight to Treating Sources.

Plaintiff argues that the ALJ violated the treating physician rule with respect to Drs. Keaton and Mandel.  Specifically, Plaintiff challenges the ALJ's decision to assign less than controlling weight to their opinions, arguing that the ALJ did not provide an adequate basis for discounting the opinions.  The Commissioner responds that the ALJ gave good reasons for giving little weight to the opinions of Drs. Keaton and Mandel. Plaintiff's argument is without merit.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case

record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

The ALJ did not err in assigning little weight to the opinion of Dr. Keaton, as she provided "good reasons" for doing so.  The ALJ explained, "[w]hile Dr. Keaton is a long time treating psychiatrist, his own treating notes during the adjudicated period contradict these opinions."  (Tr. 28.)  The ALJ supported this finding with specific examples from Plaintiff's record.  (Tr. 28-29.)  For example, she specifically addressed Dr. Keaton's August 2010 opinion concerning Plaintiff's ability to function.  (Tr. 28, 1368-1369.)  As the ALJ pointed out, Dr. Keaton opined that Plaintiff had several extreme limitations and that his mental illness impairs his ability to be gainfully employed.  (Tr. 28, 1369.)  That same month, however, Plaintiff had told Dr. Keaton that his mood was "good" and "happy" and that he had entered into a covenant marriage with a woman and joined a church.  (Tr. 28, 1551.)  On examination by Dr. Keaton, Plaintiff had good grooming,

28

hygiene, eye contact, and interaction, his thought process was linear and organized, and his thought content included "very minor and infrequent depressive thoughts and anxious thoughts." (*Id.*) Dr. Keaton opined that Plaintiff's mood and anxiety had improved and stabilized. (Tr. 28, 1552.) As the ALJ pointed out, "[t]his is flatly contradictory to an opinion that the claimant is extremely impaired in his abilities to relate to others or maintain concentration." (Tr. 28.)

In addition to Plaintiff's August 2010 examination by Dr. Keaton, the ALJ found Dr. Keaton's January 2011 opinion unreliable. (Tr. 28, 1425-1426.) On January 7, 2011, Dr. Keaton opined that Plaintiff was extremely limited in his ability to maintain attention, sustain a routine without special supervision, respond appropriately to co-workers and supervisors, and behave in an emotionally stable manner, and that he would be absent from work three times per month. (*Id.*) The ALJ found it odd that, despite the extreme limitations Dr. Keaton noted and Plaintiff's long history of drug seeking behavior and relapse into cocaine and alcohol during the adjudicated period, Dr. Keaton nonetheless opined that Plaintiff would be able to manage benefits in his own best interests. (Tr. 28-29,1426.) According to the ALJ, this is further evidence that "Dr. Keaton's insight into the claimant's functioning is unreliable." (Tr. 29.)

Additionally, in assigning less than controlling weight to Dr. Keaton's opinion, the ALJ considered several treatment records from Dr. Keaton that did not support the severity of limitations he had identified. (Tr. 27-28.) During examinations between January 2010 and March 2011, Plaintiff often had good to fair grooming, hygiene, eye contact, and interaction. (Tr. 962, 969, 1109, 1353, 1544, 1549, 1551.) Plaintiff's mood had been okay and calm (Tr. 1551), pleasant and smiling (Tr. 963), and euthymic (Tr.

1544, 1549).  Plaintiff generally had a full affect (Tr. 969, 1109, 1353, 1549, 1551), and when it was restricted, he still had good mood reactivity (Tr. 1544).  His speech was increased in quantity, but otherwise normal.  (Tr. 963, 969, 1109, 1353, 1549, 1551.)  Plaintiff's thought process was linear and organized, and his insight and judgment appeared to be good to fair.  (Tr. 963, 969, 1109, 1353, 1544, 1551, 1549.)  Thus, as the ALJ explained, the evidence surrounding Dr. Keaton's opinion does not support the extreme limitations he identified.  (Tr. 28.)  By explaining how Dr. Keaton's opinions were inconsistent with the rest of the record, the ALJ met her burden of offering good reasons to support her decision to assign less than controlling weight to Dr. Keaton.[5]

The ALJ also offered good reasons for assigning little weight to Dr. Mandel's opinion that Plaintiff cannot stand or walk for more than two hours and would be absent from work more than four times a month.[6]  (Tr. 29, 1536-1538.)  In giving this opinion

---

[5]     Although the ALJ did not give controlling weight to Dr. Keaton's opinions, she nonetheless accounted for Plaintiff's mental impairments in the RFC, limiting him to simple routine tasks with simple short instructions, making simple work-related decisions, having few workplace changes with only occasional public contact and superficial contact with co-workers and supervisors.  (Tr. 24.)

[6]     Plaintiff assumes, without explaining, that Dr. Mandel is a treating source and thus the ALJ was required to give "good reasons" for assigning his opinion less than controlling weight.  The Commissioner does not challenge Plaintiff's assumption.  The ALJ, however, did not make it clear whether she considered Dr. Mandel a treating source, and this Court has serious doubts that a physician who treats a claimant on only two occasions is a treating source.  A treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."  20 C.F.R. § 404.1502.  Generally, an ongoing treatment relationship exists when the patient sees or has seen the treating source with a frequency consistent with accepted medical practice for the type of evaluation required for the

less than controlling weight, the ALJ explained that Dr. Mandel's opinion was based on a limited treatment relationship and missing notes. (Tr. 29.) As the ALJ observed, Dr. Mandel saw Plaintiff on only two occasions, and the findings from only one of those visits are contained in the record. (Tr. 29, 1470-1472, 1477.) The ALJ noted, "[t]he limited findings on exam, such as tenderness and 4/5 strength in the left leg" do not support Dr. Mandel's opinion that Plaintiff could stand or walk for no more than two hours and would miss work four times per month. (Tr. 29.) Moreover, the ALJ explained that while Dr. Mandel gave an impression of either fibromyalgia or an arthritis condition, "[a]bsent findings to support one of those diagnoses, this opinion is based on symptoms, and not medically determinable impairments." (*Id.*) Given Dr. Mandel's limited contact with Plaintiff and the lack of treatment notes available to the ALJ when deciding Plaintiff's case, the ALJ did not err by giving little weight to Dr. Mandel's opinion. For the foregoing reasons, remand is not appropriate on this issue.

> **3. Whether the ALJ Erred by Giving Great Weight to State Consultative Examiners.**

Plaintiff argues that the ALJ erred by giving great weight to non-examining state

---

medical condition at issue. *Id.* Whether Dr. Mandel is one of Plaintiff's treating sources by virtue of examining him on two occasions within a short period of time (April 7, 2011, and May 9, 2011) is a close question. (Tr. 1536.) Moreover, it is a question that the ALJ did not decide and that neither party addressed. Given that neither Plaintiff nor Defendant has cited to significant evidence in the record for this Court to make a proper determination regarding Dr. Mandel's relationship with Plaintiff, we will assume, but not decide, for purposes of the analysis that Dr. Mandel is one of Plaintiff's treating sources.

agency physician and psychologist Drs. McCloud and Waddell, respectively.  Plaintiff relies on *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009), where the Sixth Circuit held that the ALJ's decision to accord greater weight to state agency physicians over the plaintiff's treating sources was reversible error, because the consultants' opinions were based on an incomplete case record.  Plaintiff also relies on *Stacey v. Comm'r of Soc. Sec.*, 451 Fed.Appx. 517 (6th Cir. 2011).  There, the ALJ adopted the opinion of a state agency physician who did not review an examining physician's assessment of the plaintiff's physical capabilities before preparing his report.  *Id.* at 520. The Sixth Circuit remanded the case in part because the ALJ "gave 'no indication' that he 'at least considered' that the state agency physician had not reviewed all of the evidence in the record before giving his opinion significant weight."  *Id.* (citing *Blakley*, 581 F.3d at 409).  When *Blakely* and *Stacey* are considered in light of their facts, the cases are distinguishable.

In both of those cases, the ALJ failed to adequately explain the weight given to treating and examining physicians.  Here, the ALJ made it clear that she gave "great weight" to the opinions of Drs. McCloud and Waddell.[7]  (Tr. 28.)  In doing so, she did not specifically indicate that she at least considered that Drs. McCloud and Waddell rendered their opinions in April 2010, before treating physicians Drs. Keaton and

---

[7]     The ALJ indicated that Dr. McCloud's April 27, 2010 opinion formed the basis of the physical component of the ALJ's RFC finding, and that Dr. Waddell's April 16, 2010 opinion formed the basis of the mental component.  (Tr. 28.)

Mandel[8] completed their RFC assessments.  (*Id.*)  As explained above, however, the ALJ provided justifiable reasons for giving less than controlling weight to the opinions of Drs. Keaton and Mandel and did not attempt to circumvent the treating physician rule. Thus, the overriding danger that existed in *Blakely* and *Stacey* – that the ALJ discounted treating and examining source assessments without good reason and instead relied on the opinions of consultants who did not review the entire record – is not present under the facts of Plaintiff's case.

Further, in *Blakely,* the consultative examiner, upon whose opinion the ALJ relied, did not have a complete record before him; that is, he did not have nearly 300 pages of medical records that included not only assessments by treating sources, but ongoing treatment records and notes from those treating sources.  *See Blakely,* 581 F.3d at 409.  Here, Plaintiff argues only that Drs. McCloud and Waddell did not consider Dr. Keaton's mental functional capacity assessment (Tr. 1368-1370), assessment of ability to do work-related activities (mental) (Tr. 1425-1427), or letter to Plaintiff's counsel (Tr. 1534), or Dr. Mandel's arthritis residual functional capacity assessment (Tr. 1536-1539).  (Plaintiff's Brief ("Pl.'s Br.") at 25.)  None of those records include medical findings or treatment notes; rather, the records relate to Drs. Keaton and Mandel's opinions regarding Plaintiff's residual functional capacity ("RFC").  Thus, *Blakely* is distinguishable from the facts here, as this is not a case where the consultative examiners failed to review hundreds of pages of medical records and treatment notes

---

[8]     As discussed in footnote 6, this Court is assuming, without deciding, that Dr. Mandel qualifies as a treating source.

from treating sources.  The *Blakely* Court held: "*[B]ecause much of the over 300 pages of medical evidence reflects ongoing treatment and notes by Blakley's treating sources*, 'we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not "based on a review of a complete case record."'" *Blakely,* 581 F.3d at 409 (emphasis added), citing *Fisk v. Astrue,* 253 Fed.Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-p, 1996 WL 37410, at*3).  This language suggests that the Court's main concern for requiring the ALJ to have at least considered the state consultants' reliance on an incomplete record was due to the volume and type of records that the consultants failed to review.  This is not a concern that is present here.

Moreover, the *Blakely* Court found that the ALJ failed to properly evaluate the medical opinions of the plaintiff's treating physicians.  *Blakely,* 581 F.3d at 407-408. Here, the ALJ adequately explained why she gave less than controlling weight to the opinions of Drs. Keaton and Mandel when deciding Plaintiff's RFC.  Importantly, the final responsibility for deciding a claimant's RFC or the application of vocational factors is reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  Thus, given that Drs. Keaton and Mandel, Drs. McCloud and Waddell, and the ALJ all consulted Plaintiff's treatment records before assessing his functional limitations, the fact that Drs. McCloud and Waddell did not consult the treating sources' opinions about Plaintiff's RFC is of no consequence.  The ALJ had the responsibility of determining Plaintiff's RFC and considered the opinions of both treating sources and non-examining state

agency sources in doing so.  As the ALJ here provided an adequate analysis of the opinions of Plaintiff's treating sources and articulated her reasons for assigning less than controlling weight to their opinions, this Court is not faced with the concern that the treating sources' opinions were unfairly discounted or ignored altogether.

Unlike *Blakely*, the facts in *Stacey* are not fully developed and the opinion is unpublished.[9]  Nonetheless, the instant case is distinguishable from *Stacey* for many of the same reasons that it can be set apart from *Blakely*.  In *Stacey,* not only did the ALJ fail to indicate whether he "at least considered" that the state agency physician had not reviewed all of the evidence in the record before giving his opinion significant weight, the ALJ also failed to indicate what weight, if any, he gave to Dr. Randolph, an examining source.  *Stacey*, 451 Fed.Appx. at 519.  The Court noted, "[w]e have no idea whether the ALJ (1) discounted Dr. Randolph's opinion for valid reasons, (2) discounted Dr. Randolph's opinion for invalid reasons or (3) simply ignored Dr. Randolph's opinion altogether in reaching his conclusion that [Plaintiff] has the residual functional capacity to perform light work."  *Id.*  The Court further explained: "Making matters worse (or at least heightening the need for explanation) is that [the state agency physician], whose opinion the ALJ accepted, apparently did not review Dr. Randolph's assessment of Stacey's physical capabilities in preparing his report."  *Id.* at 520.  Here, unlike *Stacey,*

---

[9]     Unpublished opinions carry no precedential weight, but often carry "persuasive weight."  *United States v. Webber*, 208 F.3d 545, 551, n.3 (6th Cir. 2000), citing *Sheets v. Moore*, 97 F.3d 164, 167 (6th Cir. 1996) (noting that unpublished opinions carry no precedential weight and have no binding effect on anyone other than the parties to the actions).

the ALJ adequately explained the weight she gave to Drs. Keaton and Waddell. While the Court in *Stacey* remanded because it could not tell whether the ALJ rejected the examining source's opinion for legitimate or illegitimate reasons or failed to considered it at all in assessing the plaintiff's RFC, the ALJ in this case provided a thorough assessment of Drs. Keaton and Mandel's opinions. As a result, this Court – unlike the *Stacey* Court – is in a position to conclude that the ALJ's heavy reliance on state agency sources is supported by substantial evidence notwithstanding the fact that they did not consider subsequent RFC opinions from treating sources when rendering their opinions.

In this Court's view, both *Blakely* and *Stacey* stand on their own facts.[10] Thus, this Court will not remand Plaintiff's case on the ground that the ALJ gave significant weight to state agency physicians' opinions when those physicians did not review the RFC assessments of Plaintiff's treating sources. Nonetheless, because Plaintiff's first assignment of error presents a basis for remanding this case, and because other courts may view the holdings of *Blakely* and *Stacey* differently, the ALJ is hereby directed to

_____

[10]     Plaintiff uses *Blakely* and *Stacey* to make the argument that consultative examiners must always consider the RFC assessments of treating sources when rendering their own opinions. The RFC opinions of treating sources, however, are often rendered after a claimant's case has been heard and the medical records have been considered. Thus, to require consultative examiners to have reviewed these opinions would be impractical, unworkable, and inefficient. If courts strictly applied the holdings of *Blakely* and *Stacey* suggested by Plaintiff without assessing the cases' unique facts, plaintiffs in future cases could routinely obtain an RFC assessment from a treating source after the consultative examiner reviews the record in a case and thereby undermine the opinions of the consultative examiners.

indicate whether she considered what impact, if any, Drs. McCloud and Waddell's

failure to review Drs. Keaton and Mandel's subsequent assessments may have had on

her RFC determination.

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and

REMANDED for proceedings consistent with this opinion.

**IT IS SO ORDERED**.


_s/ Nancy A. Vecchiarelli_
U.S. Magistrate Judge

Date: October 24, 2013